1

LATHAM & WATKINS LLP
  Miles N. Ruthberg (Bar No. 086742)

2

  *miles.ruthberg@lw.com*
  Peter Devereaux (Bar No. 119666)

3

  *peter.devereaux@lw.com*
  Terri L. Lilley (Bar No. 222764)

4

  *terri.lilley@lw.com*

5

355 South Grand Avenue
Los Angeles, California 90071-1560

6

Telephone: (213) 485-1234
Facsimile: (213) 891-8763

7

LATHAM & WATKINS LLP

8

  Pamela S. Palmer (Bar No. 107590)
  *pamela.palmer@lw.com*

9

  Angela K. Knarr (Bar No. 216032)
  *angie.knarr@lw.com*

10

650 Town Center Drive, Suite 2000
Costa Mesa, California 92626

11

Telephone: (714) 540-1235
Facsimile: (714) 755-8290

12

Attorneys for Defendants

13

14

UNITED STATES DISTRICT COURT

15

CENTRAL DISTRICT OF CALIFORNIA

16

SOUTHERN DIVISION

17

18

SHELDON PITTLEMAN,
Individually and on Behalf of All
Others Similarly Situated,

19

Plaintiffs,

20

v.

21

IMPAC MORTGAGE HOLDINGS,

22

INC., *et al.*,

23

Defendants.

| | |
|---|---|
| Master File No. | SACV-07-00970-AG(MLGx) |

(Consolidated Cases)

<u>CLASS ACTION</u>

**NOTICE OF MOTION AND MOTION
TO DISMISS THE THIRD AMENDED
CONSOLIDATED CLASS ACTION
COMPLAINT**

| | |
|---|---|
| Date: | March 9, 2009 |
| Time: | 10:00 a.m. |
| Courtroom: | 10D |

The Honorable Andrew J. Guilford,
United States District Court Judge

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 9, 2009 at 10:00 a.m. in the Courtroom of the Honorable Andrew J. Guilford, Courtroom 10D, United States District Court, Central District of California, at 411 West Fourth Street, Santa Ana, California, Defendants Impac Mortgage Holdings, Inc., Joseph Tomkinson, and William Ashmore will, and hereby do, move for dismissal of the Third Amended Consolidated Class Action Complaint ("Complaint").  This Motion is made pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (the "PSLRA") on the grounds that the Complaint fails to plead fraud with particularity or otherwise to state a claim for violation of Sections 10(b) or 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), or SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

This Motion is based on this Notice, Motion, and Memorandum of Points and Authorities; the Request for Judicial Notice and Declaration of Terri Lilley and exhibits filed concurrently, the Complaint, the Court's record in this matter, other documents specifically referenced in the Complaint, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision.

This motion is made following a conference of counsel pursuant to L.R. 7-3, via electronic and telephone communications on October 28 and 29, 2008, in which the parties discussed Plaintiff's third amended complaint, Defendants' intent to move to dismiss it with prejudice, and related filing and briefing schedules.

Dated:  December 15, 2008

Respectfully submitted,

LATHAM & WATKINS LLP

By _____/s/_____
Pamela S. Palmer
of LATHAM & WATKINS LLP
Attorneys for Defendants

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND PRELIMINARY STATEMENT ........................... 1

II.   STATEMENT OF FACTS AND ALLEGATIONS ..................................... 4

  A.   The Defendants ................................................................. 4

  B.   Impac's Alt-A Loans and Underwriting ................................. 5

  C.   The Mortgage Industry Downturn and Liquidity Crisis ..................... 8

  D.   Plaintiff's Fraud Theories .................................................. 10

III.  ARGUMENT ...................................................................... 11

  A.   Standards of Review ......................................................... 11

  B.   Plaintiff Cannot Take Back His Admissions of What Impac Disclosed by Deleting His Prior Allegations .......................... 13

  C.   Plaintiff Does Not Allege Any Material Misrepresentation ................................................................ 14

       1.   No Misrepresentation Regarding Alt-A Underwriting .......................................................... 14

       2.   No Misrepresentation Regarding "Risks and Discounts" ............................................................ 18

       3.   No Misrepresentation of Delinquencies, Repurchases, or Secondary Market Demand ......................... 19

       4.   No Misrepresentation of Optimism or Future Prospects ........................................................... 20

            a.   Claims Based on Optimistic Statements Are Immaterial As a Matter of Law ..................... 21

            b.   Claims Based on Forward-Looking Statements Are Barred by the PSLRA's Safe Harbor ....................................................... 22

  D.   Plaintiff Has Not Alleged Scienter ...................................... 24

       1.   The FEs' Comments Do Not Plead Scienter ......................... 25

       2.   Plaintiff Has Not Pled Corporate Scienter ........................... 27

  E.   Plaintiff Has Not Pled Loss Causation ................................. 28

  F.   A Growing Body of Precedent Supports Dismissal Here ................. 29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

G.     Plaintiff Does Not Allege "Control" Liability Against the Individual Defendants .......................................................................... 32

H.     The Complaint Should Be Dismissed with Prejudice ........................ 32

IV.     CONCLUSION ............................................................................................ 34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED
COMPLAINT

## TABLE OF AUTHORITIES

Page

## CASES

*Abrahamson v. Western Sav. & Loan Ass'n*,
 951 F.2d 358 (9th Cir. 1991) ........................................................... 17

*Allen v. City of Beverly Hills*,
 911 F.2d 367 (9th Cir. 1990) ........................................................... 33

*Atlas v. Accredited Home Lenders Holding Co.*,
 556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................... 31

*DSAM Global Value Fund v. Altris Software, Inc.*,
 288 F.3d 385 (9th Cir. 2002) ........................................................... 12

*Dura Pharm., Inc. v. Broudo*,
 544 U.S. 336 (2005) ..................................................... 4, 12, 13, 28

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
 353 F.3d 1125 (9th Cir. 2004) ......................................................... 22

*Glazer Capital Mgmt. LP v. Magistri*,
 —F.3d—, 2008 WL 5003306 (9th Cir. Nov. 26, 2008) .................... 27

*Greebel v. FTP Software, Inc.*,
 194 F.3d 185 (1st Cir. 1999) ........................................................... 23

*Grossman v. Novell*,
 120 F.3d 1112 (10th Cir. 1997) ....................................................... 21

*Harris v. Ivax Corp.*,
 182 F.3d 799 (11th Cir. 1999) ......................................................... 23

*Higginbotham v. Baxter Int'l, Inc.*,
 495 F.3d 753 (7th Cir. 2007) ........................................................... 26

*Huey v. Honeywell, Inc.*,
 82 F.3d 327 (9th Cir. 1996) ............................................................. 14

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) .................. 30

*In re Apple Computer*,
 243 F. Supp. 2d 1012 (N.D. Cal. 2002) ........................................... 27

*In re Applied Signal Tech., Inc. Sec. Litig.*,
 2006 WL 1050174 (N.D. Cal. Feb. 8, 2006) .................................... 22

*In re Bearing Point, Inc. Sec. Litig.*,
 525 F. Supp. 2d 759 (E.D. Va. 2007) .............................................. 33

*In re Calpine Corp. Sec. Litig.*,
 288 F. Supp. 2d 1054 (N.D. Cal. 2003) ........................................... 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED
COMPLAINT

*In re Cardinal Health, Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................ 23

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................ 17

*In re Commtouch Software Ltd.*,
   2002 U.S. Dist. LEXIS 13742 (N.D. Cal. Jul. 24, 2002) ............................... 25

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................ 22

*In re Countrywide Fin. Corp. Sec. Litig.*,
   —F. Supp. 2d—, 2008 WL 5100124 (C.D. Cal. Dec. 1, 2008) ...................... 31

*In re Daou Sys., Inc. Sec. Litig*,
   411 F.3d 1006 (9th Cir. 2005) .......................................................... 23, 24, 25

*In re Dura Pharm. Inc. Sec. Litig.*,
   548 F. Supp. 2d 1126 (S.D. Cal 2008) ...................................................... 25, 27

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) ............................................................... 3, 12, 18

*In re Impax Labs., Inc. Sec. Litig.*,
   2007 U.S. Dist. LEXIS 723 (N.D. Cal. Jan. 3, 2007) ................................... 29

*In re Infineon Tech. AG Sec. Litig.*,
   2006 WL 2925680 (N.D. Cal. Sept. 11, 2006) ............................................... 27

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................................................... 12

*In re Invision Techs., Inc. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 12166 (N.D. Cal. Jan. 24, 2006) .............................. 28

*In re Lockheed Martin Corp. Sec. Litig.*,
   272 F. Supp. 2d 944 (C.D. Cal. 2003) ............................................................ 23

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................... 32

*In re New Century*,
   —F. Supp. 2d —, 2008 WL 5147991 (C.D. Cal. Dec. 3, 2008) ...................... 31

*In re New York Cmty. Bancorp., Inc.*,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ............................................................ 19

*In re Pixar Sec. Litig.*,
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) .......................................................... 33

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003) .......................................................................... 12

NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED
COMPLAINT

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................ 12, 25, 33

*In re Silicon Storage Tech., Inc.*,
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006) .......................................... 17

*In re Skechers U.S.A., Inc. Sec. Litig.*,
    2008 WL 1721557 (9th Cir. Apr. 10, 2008) .......................................... 27

*In re Software Publ'g Sec. Litig.*,
    1994 WL 261365 (N.D. Cal. Feb. 2, 1994) ............................................ 18

*In re Splash Tech. Holdings Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................. 21

*In re Swift Transp. Co., Inc.*,
    2006 WL 1805578 (D. Ariz. Mar. 29, 2006) .......................................... 29

*In re Syntex Corp. Sec. Litig.*,
    1993 U.S. Dist. LEXIS 20420 (N.D. Cal. Sept. 1, 1993) ....................... 19

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ........................................................ 12, 34

*In re Verifone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ..................................................... 21

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................ 22, 33

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................ 33

*Lipton v. PathoGenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .............................................................. 33

*McFarland v. Memorex Corp.*,
    493 F. Supp. 631 (N.D. Cal. 1980) ....................................................... 32

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................... 12, 13, 28

*Morgan v. AXT, Inc.*,
    2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ..................................... 28

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Cos.*,
    2008 WL 4812021 (C.D. Cal. Oct. 28, 2008)................................... 29, 30

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) ................................................................ 27

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ................................................................ 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

v

NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED
COMPLAINT

*Paracor Fin., Inc. v. GE Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ........................................................................ 32

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ..................................................................... 7, 17, 30

*Shields v. Citytrust Bancorp*,
    25 F.3d 1124 (2d Cir. 1994) ........................................................... 9, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ................................................................. 1, 13, 32

*Tripp v. IndyMac Fin., Inc.*,
    2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ............................. 26, 30

*Unicom Sys., Inc. v. Elect. Data Sys., Corp.*,
    2005 WL 5801534 (C.D. Cal. Nov. 1, 2005) ..................................... 14

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ................................................. 29

*Zucco Partners, LLC v. Digimarc Corp.*,
    445 F. Supp. 2d 1201 (D. Or. 2006) ................................................. 25

**STATUTES**

15 U.S.C. § 78t ............................................................................................. 32

15 U.S.C. § 78u-4 .......................................................... 12, 13, 24, 28, 32

15 U.S.C. § 78u-5 .................................................................... 22, 23, 24

**OTHER AUTHORITIES**

H. R. Conf. Rep. No. 104-369 (1995) ....................................................... 32

NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED
COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND PRELIMINARY STATEMENT

This is Plaintiff's third attempt to plead that Impac Mortgage Holdings, Inc. and its senior officers fraudulently misled investors who purchased Impac stock before the advent of the mortgage credit crisis.  In a nutshell, Plaintiff plays a game of "fraud-by-hindsight" and claims that Impac misrepresented its underwriting practices, the quality of its Alt-A loans, and its prospects of weathering the real estate downturn.  This Court dismissed Plaintiff's Second Amended Consolidated Complaint ("SAC"), finding that Plaintiff had not pled facts demonstrating the "strong inference" required by the PSLRA that Impac's reports to investors about its mortgage business were made with any fraudulent intent:  As the Court found, "Plaintiff packs the Complaint with 30 pages of supposed misstatements and culpable acts, but none of them shows fraudulent intent or deliberate or conscious recklessness."  Dismissal Order at 3 (Docket 46) (emphasis added).

Plaintiff's Third Amended Consolidated Complaint ("TAC") adds no new facts to overcome these deficiencies, or to meet the pleading hurdles established by Congress under the PSLRA and the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007).  Dismissal Order at 3-4.  Plaintiff has had more than a year to investigate his fraud claims, during which he allegedly spoke with "numerous" former Impac employees among hundreds that Impac has been forced to let go.  TAC at p. 1, ¶¶ 100, 101.  Plaintiff's 14 months of fishing in that presumably rich sea of information, however, has yielded no "cogent" or "compelling" evidence of any fraud – because there was none.

Plaintiff's fraud theories continue to rest entirely on the same five former employees ("FEs") whose comments this Court rejected in dismissing the SAC.  As this Court found in the last round, those FEs' statements "provide no specific facts that contradict Impac's disclosures.  In fact, many of the FE statements are completely benign . . . .  Others are so vague as to be meaningless . . . .  [T]hese are

1   nothing more than vague, blanket allegations." Dismissal Order at 3-4. Plaintiff's

2   modest amendments to the TAC warrant no change in this Court's assessment.

3   Plaintiff adds no allegations whatsoever from FEs 2, 3, and 5, and offers nothing

4   new of any significance from FE4. Plaintiff puts all of his eggs in the basket of

5   FE1. But the additional commentary from FE1, even if fully credited, does not

6   contradict any of Impac's public disclosures, much less support any "strong

7   inference" of fraudulent intent.

8       FE1's new comments consist of venting his disagreement, as a rank and file

9   underwriter, with decisions by senior managers to buy unspecified "bulk loans."

10   TAC ¶¶ 47-52. FE1's opinions, however, do not contradict the veracity of Impac's

11   disclosures about its underwriting guidelines or the quality of its Alt-A loan

12   portfolio. FE1 gives no basis for negative "recommendations" on any particular

13   "bulk loans," or any basis for his assertion that management's decisions to buy

14   those "bulk loans" violated Impac's internal policies; he does not allege that the

15   purchases caused Impac any loss, or that the loans failed to perform, or that the

16   loans were even material to Impac's mortgage operations.[1] Moreover, any

17   relevance of FE1's observations is severely limited by the fact that he left Impac in

18   July 2006 – only two months into the alleged 15-month Class Period (from May

19   10, 2006 through August 6, 2007). *Id*. ¶46. Thus, FE1 cannot purport to provide

20   information that is <u>contemporaneously</u> relevant to Impac's mortgage operations or

21   disclosures during most of the alleged Class Period. FE1 also concedes that the

22   "bulk loans" he reviewed were purchased for sale to third-party investors (*id*.

23   ¶ 46:20-21, ¶ 51:15-16); thus, by definition, the loans were irrelevant to Impac's

24   disclosures regarding the quality of its long-term Alt-A investment portfolio. *Id*.

25   ¶ 44, ¶ 69 at 24:6-8, ¶ 70 at 25:5-8, ¶ 89.

26

27   [1]   Impac reported that only 4% of Impac's $4.8 billion in acquisitions and
     originations in the first half of 2006, and 4% of Impac's $1.6 billion Alt-A
28   correspondent mortgage acquisitions for the second quarter of 2006 (during
     FE1's tenure) were "bulk loans." RJN, Ex. D at D34.

The only other additions to the TAC consist of cosmetic edits to Plaintiff's own contentions, and irrelevant observations that the FBI launched a "subprime probe" (with no indication that the probe involved Impac) (*id*. ¶ 103), and that the SEC made an "inquiry" of Impac (which would hardly be surprising with respect to <u>any</u> public participant in the mortgage lending industry) (*id*. ¶ 104). The vast majority of Plaintiff's amendments consist of <u>deletions</u> from Impac's public reports previously quoted in the SAC, much of which Defendants used in their prior motion to expose conflicts, holes, and fatal defects in Plaintiff's fraud theories. *See* Decl. of Terri L. Lilley ("Lilley Decl."), Ex. 2 (redline comparison of SAC to TAC) ("Redline"). Removing those quotations from the TAC, however, can neither erase the fact that Impac made the disclosures, nor negate Plaintiff's admission that Impac did so. *See* discussion *infra* Part III.B.

The story that emerges from the TAC, even after Plaintiff's strategic deletions, is no tale of fraud, but rather of how bad things can happen to an honest company. That is why the Ninth Circuit, more than a decade ago, condemned the practice Plaintiff employs here of attempting to plead "fraud-by-hindsight." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 n.8 (9th Cir. 1994). Plaintiff starts with the decline in Impac's stock value in the wake of the real estate credit crisis, looks back at Impac's prior disclosures, and strains to manufacture theories that Impac misrepresented the risks and quality of its Alt-A loans. Unfortunately for Plaintiff, the backward look contradicts any inference of fraud because it reveals Impac's candid quarterly reports about the risks of the mortgage business, negative trends in the industry, and negative developments in its own business. *See* Lilley Decl. Ex. 1, Disclosure Appendix ("Disc. App."). Further contradicting any inference of fraud, Impac's founders and leaders – Defendants Joseph Tomkinson and William Ashmore – stood fast at the helm throughout the mortgage meltdown, never sold a single share of stock, and ultimately suffered the same (or worse) losses as any public investor. Lilley Decl. ¶¶ 4-7, RJN, Exs. U-V.

MOTION TO DISMISS THIRD AMENDED
COMPLAINT

On August 7, 2007, at the end of the alleged Class Period, Impac announced that it would no longer fund Alt-A loans because the secondary market, on which it relied for funding, had evaporated.  TAC ¶ 93.  That was the cause of Plaintiff's loss – not fraud.  There has never been any "corrective disclosure" suggesting that Impac's previous reports to investors were false.  There has been no "revelation" that Impac ever misrepresented its underwriting practices or the quality of its Alt-A mortgages.  Plaintiff's failure and inability to allege a corrective disclosure is the last nail in the coffin of this case:  The federal securities laws are not "a scheme of investor's insurance." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Therefore, absent a corrective disclosure that makes a causal connection between an alleged misrepresentation and a stock loss, there is no securities fraud claim.  Plaintiff has alleged no such connection, nor can he.  Plaintiff has struck out for the third time, and his Complaint now should be dismissed with prejudice.

## II.   STATEMENT OF FACTS AND ALLEGATIONS

### A.   The Defendants

Impac is a publicly traded mortgage company, incorporated in Maryland and headquartered in Irvine.  TAC ¶¶ 17, 110.  Plaintiff alleges that Impac's stock price was fraudulently inflated during an alleged Class Period between May 10, 2006, when Impac announced results for the first quarter of 2006, and August 6, 2007, the day before Impac announced its exit from Alt-A mortgage lending.  *Id.* ¶¶ 1, 8.  The two Individual Defendants are Impac's founders and most senior managers, Joseph Tomkinson (CEO and Chairman of the Board) and William Ashmore (President).[2]  *Id.* ¶¶ 18-20.  Tomkinson and Ashmore took Impac public in 1995.  *Id.*  Under their stewardship, Impac's doors remain open today.  Both are long-time Impac shareholders.  Neither cashed in or bailed out of their Impac stock, even when it was trading at more than $10 per share during the relevant period.  *Id.* ¶ 71.

---

[2]   Plaintiff dropped Gretchen Verdugo, Impac's former CFO, from the TAC.

## B.   Impac's Alt-A Loans and Underwriting

During the alleged Class Period, Impac specialized in originating, buying, selling, and investing in Alt-A mortgages.  Impac publicly defined its Alt-A mortgages as loans to borrowers whose credit was generally within Fannie Mae or Freddie Mac "prime" guidelines, but that had various underwriting, contractual, or credit characteristics that made the loans "non-prime" and, thus, ineligible for sale in the prime market.  TAC ¶¶ 2, 43, 44, 73, 76, 80, 85.  Impac retained some of its Alt-A loans for long-term investment through securitized borrowings (*i.e.*, keeping the loans and borrowing against them), and sold other loans to investors in the secondary market.  *See id.* ¶¶ 38, 39.  Those sales and securitized borrowings enabled Impac to pay its short term ("warehouse") lenders, buy and originate more Alt-A loans, and continue its business cycle.  *Id.* ¶ 40.

Long-term investment:  As reflected in the TAC, Impac routinely reported to investors regarding its "long term investment portfolio" of primarily "high quality" Alt-A and commercial mortgages.  *Id.* ¶ 44, ¶ 69 at 24:6-8, ¶ 70 at 25:5-8, ¶ 73 at 26:21-24, ¶ 76 at 28:4-7, ¶ 82 at 31:7-13, ¶ 85 at 32:25-33:3.  Impac described its Alt-A loans in general terms, distinguishing them from both subprime and prime loans.  *Id.*  Impac expressly defined "subprime" loans as those made to borrowers having credit scores of less than 620.  *Id.* ¶ 80 *see also* ¶ 64 (Plaintiff concedes that Impac's managers were "not flexible" about credit scores, which were "hard, documented number[s]").

In its quarterly SEC filings, Impac reported average credit scores and loan-to-value ratios of loans held in its Alt-A investment portfolio.  During the Class Period, the average credit scores in Impac's residential loan portfolio ranged from 696 to 698.  *see* TAC ¶¶ 80, 82, 85; SAC ¶¶ 64, 68, 71, 81, 84 (deleted from TAC); Redline at 27, 31, 35, 43, 47.  As of year end 2006 (the middle of the alleged Class Period), 99.8% of the loans held in Impac's own portfolio were to borrowers with credit scores above 620, meaning that less than one half of one percent of the

1  portfolio was subprime by Impac's publicly disclosed definition.  TAC ¶ 80.

2  Plaintiff does not purport to dispute or to contradict any of this factual loan data.

3      Underwriting Guidelines:  Impac also publicly disclosed certain illustrative

4  information about its internal underwriting guidelines.  As quoted in the TAC,

5  Impac explained that Alt-A loans generally had stricter underwriting guidelines,

6  including credit scores, than subprime loans.  *Id*. ¶¶ 43, 44, 80.  For example, to

7  qualify for an Alt-A loan, borrowers generally were required to have at least five

8  lines of trade credit, seasoned for at least two years, no bankruptcy within two

9  years, and no "rolling" mortgage late payments, all in contrast with lower

10  requirements of subprime borrowers.  *Id*. ¶¶ 2, 43.  Accordingly, Impac disclosed

11  that "we believe Alt-A mortgages are normally subject to lower rates of loss and

12  delinquency than subprime mortgages."  *Id*. ¶ 43.

13      As Impac's disclosures indicated, the nature of the underwriting process

14  allowed for flexibility in balancing factors when making decisions to buy or fund

15  loans (*e.g.*, a higher loan-to-value ratio might serve as a trade off for no

16  documentation of income).  *See id*. ¶ 44.  Impac disclosed that it regularly adjusted

17  underwriting guidelines "based on market conditions and actual loan

18  performance."  *Id*.[3]  Impac reported that, starting in January 2006 in response to

19  deteriorating credit trends, it tightened underwriting guidelines 17 times in 2006

20  and 20 times by March of 2007.  *Id*. ¶ 77 at 29:7-8, *id*. ¶ 80 at 30:19-20.

21  According to FE1, Impac revised the guidelines for review of "bulk loans" (*i.e.*,

22  existing loans offered by third parties for sale to Impac) "on a regular basis" and

23  had different "bulk loan" guidelines on a "broker to broker basis."  *Id*. ¶ 48.

24      Impac did not publish or report the details of its internal underwriting

25  guidelines.  The guidelines do not appear in Impac's SEC filings beyond

26

27  [3]  Impac disclosed that "[l]ending decisions are based on a risk analysis
   assessment after the review of the entire mortgage file.  Each mortgage is
28  individually underwritten with emphasis placed on the overall quality of the
   mortgage." RJN, Ex. M at M119 (2006 Form 10-K); *see also* Disc. App at 2.

1  illustrative examples, such as those quoted in the TAC.  This makes perfect sense.

2  The underwriting guidelines, changes in the guidelines, and tradeoffs in applying

3  the guidelines are matters of business judgment and management discretion.  They

4  are not regulated by the securities laws.  While Impac was obliged to speak

5  truthfully when commenting on its underwriting guidelines, Impac made clear that

6  the guidelines were <u>not</u> written in stone, and that judgmental discretion was

7  involved in underwriting and acquiring loans, whether for long-term investment or

8  for resale – as one would expect.  What Impac <u>did</u> report – and Plaintiff does not

9  dispute – are the concrete average credit scores and loan-to-value ratios of the

10  loans held in its own long-term investment portfolio.  TAC ¶¶ 80, 82, 85; *see also*

11  SAC ¶¶ 64, 68, 71, 81, 84; see also Redline at 27, 31, 34, 43, 47.[4]

12      <u>Transactions with Third Parties</u>:  Impac also sold Alt-A loans to third parties,

13  as whole loans, and borrowed from third parties on the basis of securitized loans

14  backed by mortgage collateral.  TAC ¶ 82 at 31:26-32:4.  Impac reported that it

15  received favorable ratings from credit rating agencies on its securitized Alt-A

16  borrowings due to the historically favorable loss rates on Impac's Alt-A

17  mortgages.  *Id.* ¶¶ 82 at 32:7-10, 85 at 33:15-17; *see* ¶ 80 ("the major credit rating

18  agencies, mortgage bond investors and our industry identify the Company as an

19  Alt-A lender"); RJN, Ex. P at P152 (1Q07 Form 10-Q).  Plaintiff asserts that report

20  of receiving favorable credit ratings was misleading, but does not controvert the

21  statement's veracity or coherently explain how it was misleading.  *Id.* ¶ 91.

22      Also, as Impac disclosed, third parties who bought whole loans could, under

23  contractually specified terms, demand that Impac repurchase the loans.  TAC ¶ 11,

24  77 at 29:10-11, ¶ 80 at 30:17-19.  According to Plaintiff, Impac acquired the "bulk

25  loans" of which FE1 complains for the purpose of selling them to third parties.  *Id.*

26  _____

27  [4]  As discussed below, to the extent that Plaintiff merely quibbles with the
judgments of Impac's managers in applying internal underwriting guidelines,
that is, at most, an allegation of mismanagement governed by state law, not by

28  the federal securities laws, and is not subject to any disclosure obligation.  *See
Santa Fe Indus. v. Green,* 430 U.S. 462, 477, 479 (1977).

¶ 46.  While Plaintiff makes a naked assertion that Impac "would be liable to buy back bad loans," Plaintiff does not allege – via FE1 or otherwise – that Impac ever had to repurchase, or even lost money, on any "bulk loans" that Impac purchased against FE1's recommendation.

## C.   The Mortgage Industry Downturn and Liquidity Crisis

As reflected in the TAC, the mortgage industry began to cool in late 2005 due to macroeconomic events, including falling home prices, and rising default and short-term interest rates.  *See* TAC ¶¶ 77 (4Q06), 78.  Impac reported to investors on these emerging challenges in the industry, the effects on Impac's business, and management's plans to cope.  In response to worsening delinquency trends, Impac tightened its underwriting guidelines repeatedly starting in January 2006.  *Id*. ¶ 77 at 29:7-9, ¶ 80 at 30-17-20.  As a result, Impac's loan acquisitions and originations fell off sharply, its market share declined, and its profits diminished.  *See id*. ¶ 3, (Impac's market share declined from 17th in 2004 to 48th in 2006), ¶ 70 at 24:22-25:4, ¶ 77 at 29:9-11, ¶ 78 at 29:23-27.  These undisputed allegations are flatly inconsistent with Plaintiff's contention that Impac was "relaxing" its underwriting guidelines to increase loan production.  *See id*. ¶¶ 5, 90.

Impac reported rising borrower default rates, as well as increased repurchase demands from secondary market buyers.  *Id*. ¶ 77 at 29:4-6, 29:7-9, ¶ 80 at 30:17-21.  Impac estimated loan loss reserves each quarter to anticipate <u>higher</u> future losses than it had experienced historically.  *Id*. ¶ 70 at 25:5-9; SAC ¶ 64 at 26:16-20, ¶ 68 at 30:23-27, ¶ 71 at 33:19-20, ¶ 72 at 35:20-21, ¶ 84 at 48:9-13 (deleted in TAC); Redline at 27-28, 32, 35-36, 37, 49; *see also* Disc. App. at pp. 6-9; RJN, Exs. A at A8 (1Q06 Form 10-Q), D at D33 (2Q06 Form 10-Q), H at H72 (3Q06 Form 10-Q).  Impac reported negative industry developments as they unfolded and their effects on its business.  *E.g.*, TAC ¶ 70 at 25:5 ("credit will be a bigger issue"); ¶ 74 at 27:16-17 ("difficult environment"), ¶ 77 ("deteriorating credit trends," "rising early payment defaults," "increasing repurchase activity"), ¶ 81

1  ("anticipation of a downturn"); RJN, Ex. G at G60 (11/8/06 press release)

2  ("headwinds facing our industry"); *id.*, Ex. J at J91 (2/22/07 press release) ("a

3  number of companies going out of business").

4        Impac's managers remained hopeful, however, as investors expect of

5  corporate leaders.[5]  They did not throw in the towel, but reported plans to take

6  advantage of the downturn by expanding geographically, developing a distressed

7  mortgage debt unit, and attempting to position Impac strategically.  *E.g.*, TAC ¶ 87

8  (transaction with Pinnacle to create a national platform); *see also* SAC ¶¶ 69, 72

9  (geographic expansion), ¶ 74 (positioning for industry consolidation), ¶ 82

10  (formation of distressed mortgage unit), ¶ 86 (acquisition of Florida-based lender);

11  *see also* Redline at 33, 36, 39, 46, 51.

12        By early 2007, subprime lenders were having serious trouble selling loans in

13  the secondary market.  TAC ¶ 80 at 28:3-7.  On March 5, 2007, in an effort to

14  shield its Alt-A business from the subprime fallout and preserve value for

15  investors, Impac issued a press release reiterating the differences between its Alt-A

16  loans and subprime loans, which Plaintiff does not factually controvert.  *Id.* ¶ 80;

17  RJN, Ex. L (3/5/07 press release).  The second quarter of 2007, however, brought a

18  precipitous decline in the entire mortgage industry and secondary credit markets:

19       During the second quarter, the secondary and securitization mortgage
markets have deteriorated and become more unpredictable and
volatile, making it more difficult to sell loans and securities to
investors.  In addition, because housing prices have declined, default
and credit losses have increased; investors are requiring higher
returns, reducing the prices of mortgages loans.  As a result, the loans
have not performed up to expectations and fair value of mortgage
loans has deteriorated.  The underlying reason for the deterioration of
the industry conditions appears to be initially based on the relatively
poor performance of loans originated in 2006. This decline in
performance has led to a lack of confidence by bond investors and
lenders and their reluctance to invest/lend as aggressively.

---

[5]  *See Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)
("People in charge of an enterprise are not required to take a gloomy, fearful or
defeatist view of the future; subject to what current data indicates, they can be
expected to be confident about their stewardship and the prospects of the
business that they manage.").

1   RJN, Ex. T at T175; *see also* SAC ¶ 92 (deleted from TAC); Redline at 55.

2       On August 7, 2007, Impac announced that "in light of the continued and

3   widely publicized volatility in the secondary and securitization markets," it would

4   stop funding Alt-A loans.  RJN, Ex. S at S170 (8/7/07 press release); TAC ¶ 93.

5       **D.    Plaintiff's Fraud Theories**

6       As in the SAC, Plaintiff marches through Impac's quarterly and annual SEC

7   filings, press releases, and conference calls during the alleged Class Period,

8   selectively quoting and bolding the text of Impac's reports.  He starts on May 10,

9   2006 with Impac's first quarter 2006 report, and continues through June 12, 2007,

10  the last quoted report before August 7, 2007, when Impac announced its exit from

11  Alt-A lending.  TAC ¶¶ 67-88, 93.  Plaintiff's fraud theories are muddled and

12  confusing, but appear to boil down to four contentions.[6]  *Id*. ¶¶ 11, 89-92.

13      <u>Alt-A Underwriting</u>:  Plaintiff alleges that Defendants "failed to disclose that

14  a substantial number of the Alt-A mortgages were offered to less credit worthy

15  borrowers, in violation of the Company's own underwriting guidelines."  *Id*. ¶¶ 11,

16  89.  He does not plead what "less credit worthy" means, or what "substantial

17  number" means, or specific facts that demonstrate any material "violation" of

18  internal, judgmental underwriting guidelines, or that Impac has suffered losses on

19  any loans to which Plaintiff might be referring.

20  _____

21  [6]   Plaintiff evidently abandoned an accounting fraud theory that Impac overstated
    its financial results by "under-reserving for loan losses" and by "failing to write

22  down the value of certain [unidentified] loans."  SAC ¶¶ 11(f), 88(f).  In the
    TAC, Plaintiff deleted those allegations and all quotations from Impac's

23  disclosures regarding loan loss reserves (there never were any quotations
    regarding write downs).  *See* Redline 30-32, 34-36, 42, 46-47.  A vestige of

24  each allegation, however, survives in the TAC without explanation.  *See* TAC
    ¶ 89 ("Defendants' statements regarding . . . maintenance of adequate loan loss

25  reserves . . . were false and misleading when made"); *id.* ¶ 92 ("the Company
    was overstating its financial results by failing to write-down the value of certain

26  [unspecified] loans in its portfolio").  Given that Plaintiff has made no serious
    attempt in the TAC to pursue those allegations, Defendants assume that

27  Plaintiff has abandoned them.  To the extent that Plaintiff continues to assert
    any accounting fraud claim, Defendants reserve the right to address those

28  claims in their reply, and hereby incorporate by reference all relevant portions
    of their Motion to Dismiss the SAC.  Docket 29 (Opening Br.), 44 (Reply), and
    32 (App. including accounting literature).

1     <u>Alt-A Risks and Discounts</u>: Plaintiff alleges that "as a result, the Company's

2 Alt-A mortgages were experiencing the same risks and discounts in securitization

3 as sub-prime mortgages." *Id.* ¶¶ 11, 89, 91. That vague contention appears to be

4 an argument that Impac was buying or originating subprime quality mortgages.

5 Plaintiff alleges no facts, however, to support any contention that Impac's Alt-A

6 mortgages were, or performed like, subprime mortgages, or were perceived by

7 third-party investors or credit rating agencies as subprime.

8     <u>Delinquencies, Repurchases, Secondary Market Sales</u>: Plaintiff alleges that

9 Impac failed to disclose that it was experiencing increased loan delinquencies and

10 repurchase demands, and more difficulty selling loans into the secondary market.

11 *Id.* ¶¶ 11, 89. To the contrary, Impac disclosed these developments, each quarter,

12 as they occurred, as reflected in the TAC and in SEC filings incorporated by

13 reference in the TAC. *E.g., id.* ¶¶ 69, 73, 76, 82, 85, 96; *see* Disc. App. at 3-5.

14     <u>Optimism and Future Prospects</u>: Finally, Plaintiff demands management

15 clairvoyance and alleges that Impac's statements about its "financial well being"

16 and "future business prospects" "lacked any reasonable basis when made." TAC

17 ¶ 11, *see* ¶ 89. Even assuming that a reader could divine to which statements

18 Plaintiff might be referring (presumably scattered in paragraphs 66-88), he

19 identifies no contemporaneous information known to any Defendant that would

20 belie any of Impac's statements about its financial wellbeing and future prospects.

21 As discussed below, Impac's forward-looking statements are protected by the

22 PSLRA's Safe Harbor, while vague statements of optimism by corporate leaders

23 are inactionable *per se* under established case law.

24 **III.**    **ARGUMENT**

25     **A.**    **Standards of Review**

26     To state a claim under Section 10(b), Plaintiff must allege that each

27 Defendant made a misrepresentation or omission of material fact, with "scienter,"

28 which caused Plaintiff's loss. *Dura Pharm.*, 544 U.S. at 341-42. The PSLRA and

Rule 9(b) establish "formidable pleading requirements to properly state a claim" under Section 10(b). *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008). Those requirements follow:

False Statement: Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added). To avoid pleading "fraud by hindsight," Plaintiff "must set forth . . . an explanation as to why the disputed statement was untrue or misleading when made." *GlenFed*, 42 F.3d at 1549 (emphasis in original). "This requires pleading facts that by any definition are 'evidentiary.'" *Id*. at 1548 n.7. Where, as here, the allegations are "made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Scienter: For each allegedly false statement, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That "required state of mind" is "deliberately reckless or conscious misconduct." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002) (emphasis added). Plaintiffs "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (emphasis added). The allegations "must 'strongly imply [the defendant's] contemporaneous knowledge that the statement was false when made.'" *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1102 (C.D. Cal. 2003) (emphasis in original); *see also In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 847 (9th Cir. 2003). When a forward-looking statement is challenged, the PSLRA's Safe Harbor requires a strong inference that the defendant had "actual knowledge . . . that the statement was false or misleading." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (emphasis added).

*Tellabs* held that when assessing the adequacy of scienter allegations, courts must engage in a "comparative evaluation" and consider "not only inferences urged by the plaintiff," but also "competing inferences" and "non-culpable explanations" urged by defendants that may be "rationally drawn from the facts alleged." 127 S. Ct. at 2504-05. Those include "inferences unfavorable to the plaintiffs." *Metzler*, 540 F.3d at 1061. The court's evaluation must take into account not only the allegations, but also SEC filings and other documents incorporated by reference in the complaint, as well as matters that are appropriate for judicial notice. *Tellabs*, 127 S. Ct. at 2509. Any "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504-05.

Loss Causation: To assure that the federal securities laws are not misused as "investor insurance against market losses," plaintiffs also must plead facts to demonstrate that the stock losses "resulted from the challenged statement." 15 U.S.C. § 78u-4(b)(4); *Dura Pharm*, 544 U.S. at 345-46; *Metzler*, 540 F.3d at 1063 (plaintiff must plead that the alleged fraud was "revealed to the market and caused the resulting loss"). The TAC meets none of these requirements.

## B.   Plaintiff Cannot Take Back His Admissions of What Impac Disclosed by Deleting His Prior Allegations

Most of the amendments to the TAC are deletions of quotations from Impac's disclosures that undercut Plaintiff's fraud claim. It is black letter law that Plaintiff cannot use selective quotation to state a securities claim. *See* RJN at 4-9 (citing authorities). As discussed in Defendant's Request for Judicial Notice, it is well established in securities cases that the full text of disclosures challenged in the complaint are incorporated by reference and/or are properly subject to judicial notice – not for "the truth," of course, but for the fact that the disclosures were made, and to show, in context, what investors were told, including relevant qualifications and cautionary warnings. *Id.* Thus, the full text of Impac's

1  disclosures can and should be considered in determining whether Plaintiff has

2  adequately alleged a disclosure-based fraud in the TAC.

3      Moreover, to the extent that Plaintiff actually quoted Impac's disclosures in

4  his SAC, Plaintiff admitted that Impac made these statements, most of which stand

5  entirely uncontroverted and undisputed.  *See Huey v. Honeywell, Inc.*, 82 F.3d 327,

6  333 (9th Cir. 1996) (holding that superseded portions of an amended pleading

7  "remain[] a statement once seriously made by an authorized agent"); *Unicom Sys.,*

8  *Inc. v. Elec. Data Sys., Corp.*, 2005 WL 5801534, at *4 (C.D. Cal. Nov. 1, 2005)

9  (court may consider allegations in prior complaint as evidence of the facts alleged

10  even though omitted from amended complaint).  Thus, this Court can and should

11  consider the deleted allegations in the SAC in determining whether Plaintiff has

12  adequately alleged in the TAC that Impac made fraudulent misrepresentations or

13  omissions.  Indeed, Plaintiff's careful redaction should *itself* be viewed as a

14  concession that Impac's disclosures undermine his fraud claims.

15      **C.**    **Plaintiff Does Not Allege Any Material Misrepresentation**

16      Plaintiff continues to rely entirely on the five FEs who, neither singly nor

17  collectively, demonstrate that any of Impac's disclosures were false when made.

18      **1.**    **No Misrepresentation Regarding Alt-A Underwriting**

19      Plaintiff contends that Impac "failed to disclose" that "a substantial number

20  of the Alt-A mortgages were offered to less creditworthy borrowers, in violation of

21  the Company's own underwriting guidelines."  TAC ¶ 11.  Plaintiff contends that

22  this alleged "truth" stands in conflict with Impac's "statements to the public

23  regarding the high quality of the Company's mortgages."  *Id.* ¶ 89 at 34-35.

24      That allegation of falsity is deficient.  Plaintiffs' characterization of the

25  "truth" is too vague to contradict any of Impac's statements about underwriting or

26  loan quality.  Nothing in the TAC illuminates what Plaintiff means by "substantial

27  number," or "less creditworthy borrowers."  Nor does Plaintiff allege what internal

28  underwriting guidelines were allegedly "violated," or how or when any such

1    alleged violations materially affected Impac's results of operations, or contradicted

2    any of Impac's public statements.

3         Even more fundamentally, Plaintiff's characterization of the "truth" is not

4    supported by the TAC.  None of the five FEs demonstrate that a "substantial

5    number" of Alt-A mortgages were made to "less credit worthy borrowers" or were

6    made "in violation" of Impac's underwriting guidelines.  With the exception of

7    FE1, discussed below, the FEs' alleged comments are substantially the same as in

8    the SAC.  As this Court already determined, their comments "<u>provide no specific

9    facts that contradict Impac's disclosures</u>."  Dismissal Order at 3 (emphasis added).

10        To recap, Impac disclosed that it "tightened underwriting guidelines" several

11   times in 2006, which resulted in decreased loan production and market share.  TAC

12   ¶¶ 68, 70, 77, 80; *see* ¶ 3 (Impac's market share declined).  Impac described

13   differences between its Alt-A loans, on the one hand, and prime loans and

14   subprime loans, on the other hand.  *Id*. ¶¶ 44, 77, 80.  Impac reported that the

15   average credit scores of borrowers on residential loans held in its long-term

16   investment portfolio ranged from 696 to 698 – all above subprime, which Impac

17   defined as 620.  SAC ¶¶ 64, 68, 71, 77, 81, 84 (deleted from the TAC); *see* TAC

18   ¶¶ 80, 82, 85.  Impac explained that its underwriting process balanced various

19   qualities, such as trade credit lines, prior bankruptcies, late payment histories, and

20   documentation, and that loans could be extended on a variety of terms and

21   conditions.  TAC ¶¶ 43, 44.

22        The FEs contradict <u>none</u> of those statements.  The alleged comments of FEs

23   2, 3, and 5 are <u>identical</u> to those in the SAC that this Court already found lacking.

24   *See* Redline 20-21, 25.[7]  FE4 adds nothing of substance, but merely indicates that

25   there were internal disagreements about underwriting decisions.  TAC ¶¶ 62, 65.

---

26   [7]  **FE1** still does not describe what he means by the term "bad loan pools," say
27   how the loans actually performed, or provide any quantified information of any
     kind.  TAC ¶¶ 47-53.  **FE2** allegedly "set up" loan application data and says
28   that borrowers with a "low credit score" (which he still does not specify) could
     still be offered loans based on the underwriting process.  *Id*. ¶ 56.  That is not

1   FE1's additional comments do not demonstrate any falsity, much less fraud.
2   FE1 worked at Impac starting in 2003 and left in July 2006, two months into the
3   15-month alleged Class Period.  TAC ¶ 46.  FE1 now explains that his job was to
4   sample "bulk loans" that were offered by third-parties to Impac, and destined for
5   resale by Impac to investors in the secondary market.  *Id*.  FE1 would make a
6   "recommendation" to his superiors about whether to buy the pool.  *Id*. ¶ 47.  FE1
7   admits that Impac's guidelines for review of "bulk loans" were highly flexible and
8   frequently revised.  *Id*. ¶ 48.  He complains that his "recommendations" were
9   overridden by his superiors, including Defendants Ashmore and Tomkinson, and
10  that Impac bought "bulk loans" that did not meet the internal guidelines – but he
11  does not say how so.  *Id*. ¶ 50.  FE1 complains that Ashmore violated "due
12  diligence procedures" in directing sampling of loan pools – but he does not give
13  particulars of any such instances.  *Id*. ¶ 49.  He alleges that Impac repurchased
14  loans from Countrywide in 2006 that allegedly "did not meet underwriting
15  guidelines" (but he does not say how, and claims no personal knowledge of the
16  contractual repurchase terms).  He comments that an Impac division, "Novelle,"
17  had "many bad loans" and was closed (*id*. ¶ 52) (he presumably was unaware that
18  Novelle was Impac's small subprime unit).[8]

19

20  remarkable.  FE2 still does not allege that the terms and conditions of any such
loans departed from Impac's disclosures.  **FE3** allegedly "investigated fraud"
21  on closed loans and commented nonsensically that "overstating the income of
applicants made everyone happy," with no further explanation.  *Id*. ¶ 59.  FE3
22  further undermines his credibility by complaining that management encouraged
loans that did not have documentation of income – *i.e.*, one of the disclosed
23  characteristics of Alt-A loans.  *Id*. ¶¶ 2, 88.  **FE4**, who allegedly worked in the
underwriting department for nine years before the alleged Class Period, but
24  only two months into it, merely continues to express disagreement with
underwriting decisions by more senior underwriting managers, albeit FE4
25  concedes that his superiors were "not flexible about credit scores."  *Id*. ¶¶ 62-
65.  FE4's comments add up to the unremarkable proposition that more senior
26  underwriting managers had discretion to balance positive and negative factors
to determine whether a loan should be made, and on what terms and conditions.
27  *Id*.  **FE5** claims to have prepared monthly "Loss Estimate" reports, which were
provided to Defendant Tomkinson.  *Id*. ¶ 62.  That, too, is unremarkable.

28  [8]   FE1 evidently did not read Impac's disclosure that Novelle was Impac's
subprime unit and was consolidated with Alt-A operations in January 2006.

FE1 still does not identify any underwriting or "bulk loan" review standards that were overridden.  His comments do not foreclose the likelihood that whatever weaknesses FE1 may have identified in any "bulk loan" pools were offset by strengths or specific resale opportunities that were better appreciated by his senior managers.  FE1 does not describe what supposedly was wrong with any "bulk loans," or how the loans actually performed, what happened to them, or even their materiality to Impac's mortgage operations and results.  *See supra* note 1 ("bulk loans" were only 4% of Impac's business in the first half of 2006).  Since FE1's tenure extended from 2003 through two months into the Class Period in 2006, and he gives little temporal context to his complaints, he could even be venting about "bulk loan" decisions that occurred years earlier.

To the extent that the FEs' comments boil down to criticism of loan acquisition and underwriting judgments by Impac's senior managers, that is, at most, an allegation of mismanagement, and is not subject to regulation by the federal securities laws.  "The securities laws were not designed to provide an umbrella cause of action for the review of management practices," even if they "ultimately result in losses" (which Plaintiff has not even alleged).  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).  More than thirty years ago, in *Santa Fe Industries v. Green*, 430 U.S. 462, 477 (1977), the Supreme Court drew the line between state regulation of the duties of corporate officers in managing a business, and federal regulation of disclosure to investors.  Disputes over management decisions are not regulated by Section 10(b) and need not be disclosed.  *See id.* at 479.[9]

---

RJN Ex. M at M133 ("In January 2006, the Company combined the Alt-A wholesale and subprime residential mortgage product offerings under one platform. The Company's subprime residential mortgage products previously marketed under Novelle Financial Services, Inc., are now offered by the Company's Alt-A wholesale operations, Impac Lending Group . . . .")

[9]  *See In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *23 (N.D. Cal. Mar. 10, 2006) (failure to disclose internal mismanagement is not "sufficient to trigger liability under the Exchange Act"); *Abrahamson v. W. Sav. & Loan Ass'n*, 951 F.2d 358, 358 (9th Cir. 1991) (deficiencies in the administration of

## 2.     No Misrepresentation Regarding "Risks and Discounts"

Plaintiff asserts that Impac "failed to disclose" that its Alt-A mortgages "faced many of the same risks and discounts in securitization as subprime mortgages." TAC ¶¶ 11, 89. Plaintiff leaves the reader to guess which of Impac's statements were supposedly false in light of that alleged "truth," thus breaking the first rule of pleading "with particularity" under Rule 9(b) and the PSLRA.

In any event, the TAC does not give any factual basis to support the thrust of Plaintiff's assertion that Impac's Alt-A loans performed like subprime loans and/or were perceived as subprime by third party investors. Plaintiff is playing a game of "fraud by hindsight" – *i.e.*, he is assuming that because the secondary markets dried up for Impac's Alt-A mortgages, just as they did for subprime mortgages, that the "risks and discounts" were the same. *See GlenFed*, 42 F.3d at 1547-49 (rejecting "fraud by hindsight"). That assumption has no basis in the factual allegations and is flatly contradicted by objective differences in quality between Alt-A and subprime loans, which Impac reported (as quoted in the TAC and SAC) and Plaintiff does not factually controvert.

For one thing, as noted, Impac reported concrete data on average credit scores and loan-to-value ratios in its long-term Alt-A investment portfolio, and how that data differed from subprime loans. TAC ¶¶ 80, 82, 85; *see* SAC ¶¶ 64, 68, 71, 81, 84; Redline at 27, 31, 34, 43, 47. Plaintiff does not even attempt to dispute the reported data. To the extent that Plaintiff quibbles with Impac's description of its Alt-A investment portfolio as "high credit quality" (TAC ¶ 89), that is merely a choice of adjective: investors could make their own decisions

---

loan loss reserves were mismanagement claims, not fraud claims under 10(b)); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (non-disclosure of purported mismanagement is not cognizable under federal law, because to hold otherwise, "would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship"); *In re Software Publ'g Sec. Litig.*, 1994 WL 261365, at *7 (N.D. Cal. Feb. 2, 1994) (a company "bears no duty to disclose inadequacies in its own management's performance to the investing public").

1   based on Impac's hard data.  *See In re New York Cmty. Bancorp., Inc.*, 448 F.

2   Supp. 2d 466, 480 (E.D.N.Y. 2006) ("a company has no duty to disparage its own

3   competitive position . . . when it has provided accurate hard data from which

4   analysts and investors can draw their own conclusions") (quoting *In re Syntex*

5   *Corp. Sec. Litig.*, 1993 U.S. Dist. LEXIS 20420, at *22 (N.D. Cal. Sept. 1, 1993)).

6          Moreover, Plaintiff has alleged nothing to support a contention that third

7   parties "discounted" Impac's Alt-A securitizations as though they were subprime.

8   To the contrary, as alleged in the TAC, Impac received favorable ratings from

9   credit rating agencies on its securitized Alt-A borrowings due to the historically

10  favorable loss rates on its mortgages.  TAC ¶¶ 82, 85 at 33:15-17; RJN, Ex. P at

11  P152 (1Q07 Form 10-Q); *see also* TAC ¶ 80 ("the major credit rating agencies,

12  mortgage bond investors and our industry identify the Company as an Alt-A

13  lender").  Indeed, the SAC and TAC report several large securitizations that Impac

14  achieved during the alleged Class Period, and give no basis to infer that those

15  transactions were burdened with subprime "discounts."  *Id.* ¶ 83 (1Q07); SAC ¶ 67

16  (2Q06), ¶ 70 (3Q06); ¶¶ 82-83.  Plaintiff has not alleged, and cannot, that Impac's

17  Alt-A loans have performed like subprime loans, or, even in hindsight, had the

18  same losses.  The disclosure advocated by Plaintiff – *i.e.*, that the "risks and

19  discounts" of Impac's Alt-A loans and subprime loans were "the same" – would

20  have been inaccurate and misleading.

21          **3.      No Misrepresentation of Delinquencies, Repurchases, or**

22                  **Secondary Market Demand**

23          Plaintiff alleges that Impac "failed to disclose" increased loan delinquencies

24  and repurchase demands and that it had more difficulty selling loans into the

25  secondary market.  TAC ¶¶ 11, 89.  Once again, Plaintiff alleges no facts to

26  support those contentions, and his own allegations refute them.  As noted above,

27  Impac reported to investors each quarter on the events that had unfolded, including

28  its experience of increasing delinquencies, repurchase demands, and challenging

1   conditions in the secondary market.  *E.g.*, TAC ¶ 77 at 29:4-12, ¶ 80 at 30:17-19;

2   SAC ¶ 82 at 44:27-28; *see also* TAC ¶ 70 at 25:5 ("credit will be a bigger issue");

3   ¶ 74 at 27:16-17 ("difficult environment"), ¶ 77 ("deteriorating credit trends,"

4   "rising early payment defaults," "increasing repurchase activity").  As

5   delinquencies in Impac's own portfolio increased, Impac reported loan loss

6   reserves each quarter to anticipate <u>higher</u> future losses.  TAC ¶ 70 at 5-8; SAC ¶ 64

7   at 26:16-20, ¶ 68 at 30:23-27, ¶ 71 at 33:19-20, ¶ 72 at 35:20-21, ¶ 84 at 48:9-13

8   (deleted from the TAC); Redline at 26-27, 32, 35, 37, 49.  Notwithstanding

9   Plaintiff's strategic deletion of Impac's disclosures from the TAC, Plaintiff cannot

10  claim that Impac "failed to disclose" negative developments about delinquencies,

11  repurchases, or the secondary market.

### 4.    No Misrepresentation of Optimism or Future Prospects

13          Plaintiff alleges that positive statements by Impac's senior managers about

14  Impac's "financial well being" and "future business prospects" were "lacking in

15  any reasonable basis when made."  TAC ¶¶ 11, 92.  Once again, Plaintiff violates

16  the first rule of "pleading with particularity" and leaves the reader to speculate as

17  to which alleged statements he attacks as false.

18          As quoted in the TAC, Impac's communications with investors included

19  informational data, discussion of developments and trends, and management's

20  outlook for the future.  In some of the quoted comments, Impac's CEO, Joseph

21  Tomkinson, expressed cautious confidence that Impac was positioned to navigate

22  the turbulent business cycle.  *E.g.*, *id*. ¶ 67 (3/06, Impac is "well positioned to

23  deliver long term value"), ¶ 70 (5/06, "we believe that opportunities will be greater

24  toward the end of the year"), ¶ 74 (8/06, "we . . . remain cautiously optimistic"),

25  ¶ 75 (11/06, "we continue to believe . . . that the strategies we have put into

26  place . . . should position the Company to increase shareholder value in 2007"),

27  ¶ 77 (2/07, "we continue to believe that the Company remains well-capitalized,

28  diversified . . . and positioned to successfully navigate through this cycle").  While

Impac warned investors explicitly about the possibility of a credit crisis in its 2006
Form 10-K,[10] Impac's managers obviously could not be expected to predict the
ultimate staggering effects of the credit crisis on Impac's business.

As shown below, two legal principles bar any securities fraud claim based on
the sort of optimistic and/or forward-looking comments alleged in the TAC:
(1) generalized statements of optimism by corporate executives are immaterial as a
matter of law, and (2) the Safe Harbor under the PSLRA bars any claim based on
the alleged forward-looking statements.

**a.     Claims Based on Optimistic Statements Are Immaterial
As a Matter of Law**

Plaintiff cannot base a securities fraud claim on general statements of
optimism by Impac's CEO.  Courts have long recognized that "[p]eople in charge
of an enterprise are not required to take a gloomy, fearful or defeatist view of the
future; subject to what current data indicates, they can be expected to be confident
about their stewardship and the prospects of the business that they manage."
*Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).  Accordingly,
investors "know how to devalue the optimism of corporate executives."  *In re
Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865
(9th Cir. 1993).  For this reason, it is well established in securities cases that
"vague statements of corporate optimism" or "puffing" are not actionable.
*Grossman v. Novell*, 120 F.3d 1112, 1119-1120 (10th Cir. 1997).[11]  Moreover,

---

[10]   RJN, Ex. M at M120 (2006 Form 10-K) (warning investors that the subprime
crisis might affect the Alt-A mortgage industry with increased delinquencies
and the inability to obtain further financing and "[t]his may result in a reduction
of our mortgage originations and acquisitions and reduce or eliminate the
liquidity currently available to us to fund our operations").

[11]   *Accord In re Splash Tech. Holdings Sec. Litig.*, 160 F. Supp. 2d 1059, 1077
(N.D. Cal. 2001) ("'strong,' . . . 'robust,' 'well positioned,' 'solid' and
'improved'" are vague and nonactionable); *In re Calpine Corp. Sec. Litig.*, 288
F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) ("strong" and "solid" are too vague to
be actionable under the PSLRA); *In re Copper Mountain Sec. Litig.*, 311 F.
Supp. 2d 857, 880 (N.D. Cal. 2004) ("characterizations of business as 'solid'
and 'on track' are best characterized as inactionable puffery"); *In re Wet Seal,*

1   Impac's executives did not express empty optimism, but had plans and strategies to

2   position Impac to take advantage of potential opportunities presented by the

3   industry downturn – *i.e.*, they disclosed reasons to believe in Impac's future.  *E.g.*,

4   TAC ¶ 87 (transaction with Pinnacle to create a national platform).

5   　　　　　　　　　**b.　　Claims Based on Forward-Looking Statements Are**

6   　　　　　　　　　　　　**Barred by the PSLRA's Safe Harbor**

7   　　　　To the extent that Plaintiff challenges Impac's forward-looking statements,

8   Defendants are further shielded from liability by the PSLRA's Safe Harbor.  In

9   essence, Plaintiff argues that Impac and its executives defrauded investors by

10   sharing their beliefs in the strength of Impac's long-term business prospects in

11   spite of the market downturn.  TAC ¶¶ 67, 70, 74, 75, 77, 78, 80, 84, 86.  That is

12   precisely the kind of corporate guidance to investors that the Safe Harbor was

13   intended to encourage and protect.  Congress sought to encourage public company

14   executives to share forward-looking assessments with investors without fear of

15   exposure to lawsuits if matters turned out other than as predicted.  Thus,

16   "[w]hether a statement qualifies for the safe harbor is an appropriate inquiry on a

17   motion to dismiss.  So long as the safe harbor requirements are met, liability

18   cannot exist as a matter of law."  *In re Applied Signal Tech., Inc. Sec. Litig.*, 2006

19   WL 1050174, at *13 (N.D. Cal. Feb. 8, 2006) (citing *Employers Teamsters Local

20   Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir.

21   2004)); *see also* 15 U.S.C. § 78u-5(e).

22   　　　　A statement is "forward-looking" "as long as the truth or falsity of the

23   statement cannot be discerned until some point in time after the statement is

24   made."  *Applied Signal Tech.*, 2006 WL 1050174, at *13; *see* 15 U.S.C. § 78u-

25   5(i)(1) , (1)(D).  Thus, Impac's comments that its fundamentals remained strong

26   were forward-looking.  *See In re Daou Sys., Inc. Sec. Litig*, 411 F.3d 1006, 1021

27

28   *Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167-68 (C.D. Cal. 2007) ("continuing to
gain ground," "on track to deliver improved financial performance," "early
signs of improvement," were inactionable).

1   (9th Cir. 2005) (statements that company's pipeline position was "extremely

2   strong" and "remained healthy and would fuel future earnings growth" fell within

3   Safe Harbor); *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (statements

4   that "our fundamental business and its underlying strategies remain intact" and that

5   product was "well positioned" were forward-looking under the Safe Harbor).

6          Under the PSLRA, forward-looking statements are not actionable if either

7   (1) "accompanied by meaningful cautionary statements identifying important

8   factors that could cause actual results to differ materially" or (2) made without

9   "actual knowledge" that the statement was false or misleading.  15 U.S.C. § 78u-

10  5(c)(1); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 949 (C.D.

11  Cal. 2003) (forward-looking statements are protected if "either" prong is met).[12]

12  Impac's statements are fully protected by each independent prong.

13         First, the press releases and SEC filings cited in the TAC all included

14  meaningful cautionary warnings about factors that could cause Impac's future

15  results to differ from expectations.  *See* Disc. App. at 10-11.  The Safe Harbor also

16  applies to *oral* statements made during Impac's conference calls.  15 U.S.C. § 78u-

17  5(c)(2).  At the start of each call, Impac warned listeners that the speakers would

18  be making "forward-looking comments" and identified contemporaneous SEC

19  filings that disclosed important risk factors that could cause actual results to differ.

20  *Id.*; RJN, Exs. C, F, I, K, Q.  Those SEC filings contained thoughtful disclosures of

21  risks to Impac's mortgage lending business – including the very risks that came to

22  pass.  *See* Disc. App.; RJN, Ex. M at M120 (2006 Form 10-K) (warning that

23  increased delinquencies and inability to obtain further financing may "reduce or

24  eliminate the liquidity currently available to us to fund our operations").  These

25  warnings brought Impac's forward-looking statements securely into the Safe

26  Harbor.  15 U.S.C. § 78u-5(c)(2)(B)(i).

27  ───────────────
[12] *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir. 1999) ("The safe
28  harbor has two alternative inlets"); *In re Cardinal Health, Inc. Sec. Litig.*, 426
    F. Supp. 2d 688, 746 (S.D. Ohio 2006) (safe harbor prongs are "independent").

1    Second, Plaintiff fails to allege any "strong inference" that any Defendant

2  made a forward-looking statement with *actual knowledge* that the statement was

3  false.  *See* 15 U.S.C. § 78u-4(b)(2) (plaintiffs must plead "strong inference" of the

4  "required state of mind"); *id.* § 78u-5(c)(1)(B) (liability for forward-looking

5  statement requires "actual knowledge" of falsity).  Plaintiff alleges no factual basis

6  to infer that Tomkinson or Ashmore knew that Impac's future could not be

7  consistent with the outlook expressed to investors.  *See In re Daou Sys.*, 411 F.3d

8  at 1021-22 (forward-looking statements not actionable where plaintiffs failed to

9  plead facts demonstrating knowledge of actual falsity).  Plaintiff's claims based on

10  forward-looking statements are barred by the Safe Harbor.

11      **D.    Plaintiff Has Not Alleged Scienter**

12    This Court dismissed the SAC because Plaintiff failed to plead facts giving

13  rise to a "strong inference" of scienter:  "Plaintiff packs the Complaint with 30

14  pages of supposed misstatements and culpable acts, but none of them shows

15  fraudulent intent or deliberate or conscious recklessness."  Dismissal Order at 3.

16  Plaintiff had argued that scienter should be inferred from (1) the FEs and internet

17  bloggers, (2) Defendants' alleged access to unspecified "spreadsheets" and "Loss

18  Estimate" reports, and (3) regulatory certifications by the CEO and CFO under

19  SOX.  This Court already rejected all three bases for inferring scienter.  This Court

20  found that Plaintiff's FE and blogger allegations were "completely benign . . . so

21  vague as to be meaningless . . . nothing more than vague, blanket allegations [and]

22  nothing more than idle Internet speculation."  *Id.* at 3-4.  The Court rejected

23  Plaintiff's "vague accusations about 'spreadsheets' and 'Loss Estimate' reports" as

24  "too generic to satisfy the scienter requirement."  *Id.* at 4.  The Court also held that

25  "signing a SOX certificate is not adequate to establish scienter."  *Id.*

26    In the TAC, Plaintiff relies on precisely the <u>same</u> scienter allegations and

27  arguments, with the following exceptions:  Plaintiff dropped the internet bloggers

28  and added commentary from FE4 and FE1.  The question, then, is whether

1    Plaintiff's amendments to the FE allegations give rise to a "strong inference" that

2    Tomkinson or Ashmore – the sole alleged "speakers" for Impac – made any

3    "deliberately reckless or conscious" misrepresentation regarding Impac's Alt-A

4    loans or underwriting in light of their alleged contemporaneous knowledge.  *Id.* at

5    3 (citing *Silicon Graphics*, 183 F.3d at 979).  The answer clearly is "no."  The new

6    allegations come nowhere close to demonstrating fraudulent knowledge or intent.

7        **1.**    **The FEs' Comments Do Not Plead Scienter**

8            In Ninth Circuit jurisprudence, "[t]o determine the adequacy of [Plaintiff's]

9    allegations" based on anonymous sources, the Court should evaluate 'the level of

10   detail provided by the confidential sources, the corroborative nature of the other

11   facts alleged [], the coherence and plausibility of the allegations, [] the number of

12   the sources, [and] the reliability of the sources.'"  *In re Dura Pharm. Inc. Sec.*

13   *Litig.*, 548 F. Supp. 2d 1126, 1132 (S.D. Cal. 2008) (quoting *Daou*, 411 F.3d at

14   1015).  The allegations must be discounted if the sources are "unreliable."  *Id.*, 548

15   F. Supp. 2d at 1139.  Moreover, hearsay, rumors, and innuendo add nothing to an

16   attempt to plead scienter.[13]

17           The TAC completely fails to remedy the shortcomings of the FE allegations

18   in the SAC.  The statements attributed to FE2, FE3, and FE5 are <u>identical</u> to those

19   rejected in the SAC, and need not be rehashed.  *See supra* p. 15 & note 7;

20   Dismissal Order at 3-4.  In the TAC, Plaintiff adds, with respect to FE4, only that

21   he remembers "disagreements regarding the loan approval process on a regular

22   basis" and he "'saw it all the time where we'd deny it [a loan] and they say, yeah,

23   we could do this.'"  *Id.* ¶¶ 62, 65 (alteration in original).  While those comments

24   indicate that FE4 disagreed with underwriting decisions, they do not show that

25

26   _____

     [13]  *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1208 (D. Or.

27   2006) (allegations based on hearsay, rumor, or speculation demonstrate neither
     falsity nor scienter); *In re  Commtouch Software Ltd.*, 2002 U.S. Dist. Lexis

28   13742, at *10 (N.D. Cal. Jul. 24, 2002 (noting impropriety of witness
     allegations that were "merely regurgitating gossip and innuendo").

1   decision-makers disregarded underwriting guidelines, or that any Defendant was

2   aware of any material departure from underwriting guidelines, much less any

3   inconsistency between Impac's practices and disclosures.  *Tripp v. IndyMac Fin.,*

4   *Inc.*, 2007 WL 4591930, at *3 (C.D. Cal. Nov. 29, 2007) (beliefs of confidential

5   witnesses did not support scienter where plaintiffs "failed to allege that the

6   individual Defendants shared these beliefs . . . or even that they were aware of

7   them and found them to be reliable and justified").

8          As noted, FE1's amended commentary is marginalized by several facts.  As

9   Plaintiff now explains, that FE1 was only sampling "bulk loans" for potential

10  resale to third-party investors, and was working at least two levels below Ashmore.

11  TAC ¶¶ 46, 47.  Further, FE1 left Impac two months into the Class Period in July

12  2006 due to alleged pique at management's failure to follow his recommendations.

13  *Id*. ¶¶ 49, 51.[14]  Thus, he was not with Impac during four out of the six quarterly

14  reporting periods encompassed by the alleged Class Period (*i.e.*, he was not

15  employed by Impac in 3Q06 through 2Q07).

16         While FE1 complains that his "recommendations" were overruled by his

17  superiors and that "bulk loans" were purchased that "did not satisfy IMH

18  guidelines," those allegations are vague and non-specific.  The allegations lack

19  relevant temporal context, materiality, and sufficient detail to show that

20  Tomkinson or Ashmore had information that contradicted Impac's disclosures

---

22  [14]  FE1's departure rationale invokes the Seventh Circuit's doubt regarding the
       credibility of anonymous witnesses in *Higginbotham v. Baxter Int'l, Inc.*, 495
23     F.3d 753, 757 (7th Cir. 2007):  "[i]t is hard to see how information from
       anonymous sources could be deemed 'compelling' or how we could take
24     account of plausible opposing inferences.  Perhaps these confidential sources
       have axes to grind."  Moreover, changes to FE1's allegations render his
25     credibility suspect.  In the SAC, FE1 complained that Ashmore "overrode the
       decision of the underwriting department . . . without explaining his actions."
26     SAC ¶ 47.  After this Court noted that such an allegation was benign (Dismissal
       Order at 3), FE1 changed his comment to claim that Ashmore defended his
27     decisions to override underwriting's advice because "everybody is doing it," or
       "if we didn't do it someone else would."  TAC ¶ 48; *cf.* SAC ¶ 47.

1    about its Alt-A loans or underwriting.  *See In re Dura Pharm.*, 548 F. Supp. 2d at

2    1132; *In re Skechers U.S.A., Inc. Sec. Litig.*, 2008 WL 1721557, at *1 (9th Cir.

3    Apr. 10, 2008)  (statements from a February 2002 sales meeting did not undermine

4    the company's public statements made in April and July 2002).  FE1 does not even

5    purport to have communicated directly with Ashmore or Tomkinson regarding his

6    review of any "bulk loan" pools.  The bottom line is, FE1's complaint that senior

7    managers overrode his "recommendations" on "bulk loan" purchases does not

8    demonstrate disregard of Impac's underwriting guidelines by Tomkinson or

9    Ashmore, much less any fraudulent intent to mislead Impac's investors.

10              **2.      Plaintiff Has Not Pled Corporate Scienter**

11         Since Plaintiff has failed to allege scienter on the part of Tomkinson or

12   Ashmore, he has failed to allege corporate scienter against Impac.  A corporation

13   cannot act without human agents; thus, "a defendant corporation is deemed to have

14   the requisite scienter for fraud only if the individual corporate officer making the

15   statement has the requisite level of scienter."  *Glazer Capital Mgmt. LP v.*

16   *Magistri*, —F.3d—, 2008 WL 5003306, at *7 (9th Cir. Nov. 26, 2008) (allegation

17   that another employee knew that statement signed by CEO was untrue does not

18   plead corporate scienter); *In re Apple Computer,* 243 F. Supp. 2d 1012, 1023 (N.D.

19   Cal. 2002) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435-36

20   (9th Cir. 1995)).  Thus, to state a section 10(b) claim against Impac, Plaintiff must

21   plead scienter on the part of at least <u>someone</u> making a challenged statement.

22   *Glazer*, 2008 WL 5003306, at *5-6; *In re Infineon Tech. AG Sec. Litig*., 2006 WL

23   2925680, at *3 (N.D. Cal. Sept. 11, 2006) (failure to plead scienter against the

24   individual defendants necessarily means plaintiffs fail to plead scienter with

25   respect to the corporation); *In re Invision Techs., Inc. Sec. Litig.*, 2006 U.S. Dist.

26   LEXIS 12166, at *22-23 (N.D. Cal. Jan. 24, 2006) (same).  Plaintiff failed to do so

27   and, therefore, has failed to plead corporate scienter against Impac.

28

### E.    Plaintiff Has Not Pled Loss Causation

This case fails on the additional, independent ground that Plaintiff has not alleged facts demonstrating that the drop in Impac's stock price at the end of the alleged Class Period, which Plaintiff claims as his "loss," was caused by Impac's allegedly false statements. *Dura Pharm.*, 544 U.S. at 342; 15 U.S.C. § 78u-4(b)(4) (under the PSLRA, a plaintiff must prove that the defendant's allegedly false statement "caused the loss for which [P]laintiff seeks to recover damages").  The enabling premise of a "stock drop" class action is that an alleged misrepresentation fraudulently inflated the stock price.  Investor reliance is *assumed* on the theory that, in an efficient market, investors rely on the integrity of the stock price ("fraud-on-the-market"). *Dura*, 544 U.S. at 341-42.  But stock prices fluctuate up and down for reasons unrelated to alleged fraud.  Thus, to avoid transforming the securities laws into "broad insurance against market losses" (*id*., 54 U.S. at 345), plaintiffs must allege a "corrective" disclosure that refutes the allegedly false statements and results in a decline in the stock price:  In other words, plaintiffs must allege facts showing that their "loss" – *i.e.*, the decline in stock price (deflation) – was caused by the correction of the alleged misrepresentation, and not by other market conditions.  *Id.* at 342-46; *see Morgan v. AXT, Inc.*, 2005 WL 2347125, at *16 (N.D. Cal. Sept. 23, 2005) ("Because other factors may have affected the Company's stock price during the Class Period, Plaintiff must allege more than just that the alleged misrepresentations inflated the stock price.").

This means that, here, Plaintiff must show that Impac's stock price fell after "the truth became known" correcting Impac's allegedly false disclosures about its underwriting and/or the quality of its Alt-A loans.  *See Dura*, 544 U.S. at 342; *Metzler*, 540 F.3d at 1063 (plaintiff must plead that the alleged fraud was "revealed to the market and caused the resulting loss"); *In re Swift Transp. Co., Inc.*, 2006 WL 1805578, *5 (D. Ariz. Mar. 29, 2006) (plaintiff must tie the alleged loss to the "revelation of information that [defendant] previously misrepresented"); *In re*

1  *Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 723, at *14 (N.D. Cal. Jan. 3,

2  2007) (failure to plead "loss causation" where the alleged corrective disclosure

3  "did not indicate that the [previously issued] financial statements or revenues

4  would be altered"); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 945-47 (D.

5  Ariz. 2007) (failure to plead "loss causation" where press release did not reveal

6  "truth" about alleged misrepresentations and omissions).

7      Plaintiff has not and cannot plead any such facts.  The only "revelation" at

8  the end of the Class Period on August 7, 2007 was that the secondary market for

9  residential mortgage loans had dried up and that Impac was forced to withdraw

10  from Alt-A lending.  TAC ¶ 93; SAC ¶¶ 92-94.  For that, Plaintiff has no one to

11  blame.  The mortgage meltdown was a risk of being invested in the mortgage

12  industry in 2007.  There has never been any "revelation" that Impac

13  misrepresented the quality of its Alt-A loans or underwriting practices (because it

14  did not).  Plaintiff's failure and inability to plead the required element of "loss

15  causation" vitiates his securities fraud claim and requires dismissal of this case.

16      **F.   A Growing Body of Precedents Supports Dismissal Here**

17      Courts have now ruled on motions to dismiss in at least a half-dozen

18  securities class actions filed against publicly traded mortgage companies, and have

19  dismissed some complaints and sustained others.  The allegations before this Court

20  are even weaker than those in the cases that have been dismissed, and are sharply

21  distinguishable from the allegations in cases that have been sustained.

22      In *N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Cos.*, 2008 WL 4812021,

23  at *4-7 (C.D. Cal. Oct. 28, 2008), the Court dismissed fraud claims against a

24  subprime lender, Fremont General, despite the FDIC's preliminary findings that

25  Fremont had been operating without adequate underwriting criteria, which led to

26  increased risk of delinquencies and losses.  *Id*. at *2.  The Court appropriately

27  distinguished between those criticisms of management and the separate issue of

28  disclosure fraud.  The Court found that plaintiffs failed to identify any materially

1   misleading disclosure or scienter in Fremont's statements and opinions about the

2   quality of its underwriting practices.  *Id*. at *5-7.

3        Similarly, in *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 U.S. Dist.

4   LEXIS 44166 (W.D. Mo. June 4, 2008), the Court dismissed fraud claims against a

5   mortgage lender, where plaintiffs complained of weak internal controls, inadequate

6   loan loss reserves, and "bad" underwriting practices.  *Id*. at *12-14.  Observing that

7   poor management decisions "do not constitute securities fraud" (citing *Santa Fe*,

8   430 U.S. at 474-80), the Court found that "Plaintiff's allegations are more

9   consistent with a company and executives confronting a deterioration in the

10   business and finding itself unable to prevent it than they are with a company and

11   executives recklessly deceiving the investing community."  *Id*., at *15.

12        Likewise, in *IndyMac*, the Court dismissed fraud claims against IndyMac, an

13   Alt-A lender, where plaintiffs alleged that IndyMac had inappropriately "loosened

14   its underwriting guidelines" and maintained inadequate internal controls and risk

15   hedging strategies.  2007 U.S. Dist. LEXIS 95445, at *8-9.  The Court held that

16   criticisms of IndyMac's underwriting and operations by "confidential witness" did

17   not support scienter because there was no basis to infer that defendants knew of the

18   witnesses' views or "found them to be reliable and justified."  *Id*. at *9.  The

19   strongest inference that emerged from the complaint was that "Defendants were

20   simply unable to shield themselves as effectively as they anticipated from the

21   drastic change in the housing and mortgage markets[.]"  *Id*. at *10-11.

22        As in *Fremont*, *Novastar*, and *IndyMac*, the Complaint against Impac does

23   not paint a picture of corporate managers "cooking the books" or lying to

24   investors, but of corporate managers attempting to cope with deteriorating credit

25   and market conditions.  Plaintiff's criticisms of how they managed those efforts –

26   including the underwriting process, and business judgments about the purchase and

27   sale of "bulk loans" – simply are not allegations of securities fraud under Section

28

1    10(b).  *See supra* p. 17 & note 9 (alleged mismanagement is not governed by the

2    federal securities laws).

3         In contrast, in the cases against mortgage lenders that have survived motions

4    to dismiss, plaintiffs were able to plead contemporaneous knowledge by executives

5    of dramatic loosening of underwriting standards in order to increase loan

6    production volume, coupled with declining or inadequate loan loss reserves, in

7    conflict with the lender's public statements.  *See In re New Century*, —F. Supp. 2d

8    —, 2008 WL 5147991 (C.D. Cal. Dec. 3, 2008); *In re Countrywide Fin. Corp. Sec.*

9    *Litig.*, —F. Supp. 2d—, 2008 WL 5100124 (C.D. Cal. Dec. 1, 2008); *Atlas v.*

10   *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1154-56 (S.D. Cal.

11   2008).[15]  In *New Century* and *Atlas* there also were allegations that the defendants

12   were "cooking the books" to conceal business setbacks.  *New Century*, 2008 WL

13   5147991, at *20; *Atlas*, 556 F. Supp. 2d at 1149, 1150-53, 1156.  Defendants in

14   *New Century* and *Countrywide* allegedly sought to avoid losses in their own

15   portfolios by selling company stock during the class period.  *New Century*, 2008

16   WL 5147991, at *22; *Countrywide*, 2008 WL 5100124, at *40-41.

17        Here, on the other hand, Impac tightened its underwriting guidelines leading

18   to a reduction in loan production and market share.  TAC ¶¶ 3, 70, 77, 78.  Impac

19   also increased its loan loss reserves steadily throughout the alleged Class Period.

20   Plaintiff's weak crop of confidential witnesses contradicts none of Impac's public

21   statements and puts no contemporaneous information in the hands of any

22

23   [15]  In *New Century*, a bankruptcy examiner's report, internal reports and audits,
     and multiple confidential witnesses identified an "explosive" proliferation of

24   high risk loans to increase volume, and inadequate loan loss reserves, and stated
     how those matters allegedly were known to defendants.  2008 WL 5147991, at

25   15, 18-20.  In *Countrywide,* both confidential and <u>identified</u> witnesses, as well
     as specific internal company documents, verified dramatic loosening of

26   underwriting standards while the CEO publicly denied that such changes would
     take place.  2008 WL 5100124, at *3-7, *45-46 & n.7.  In *Atlas*, the complaint

27   alleged how defendants knew that their public statements differed from actual
     practice, and how defendants personally directed deviations from guidelines;

28   meanwhile, the company decreased loan loss reserves while credit conditions
     deteriorated.  556 F. Supp. 2d 1142, 1149-52, 1154-56.

1   Defendant that demonstrates fraudulent intent.  Moreover, Impac's senior officers

2   did not sell a single share and sustained substantial investment losses along with

3   Impac's public shareholders.  There is simply no evidence of fraud alleged here.

4       **G.    Plaintiff Does Not Allege "Control" Liability Against the**

5                  **Individual Defendants**

6       Because there is no alleged primary violation of Section 10(b), there is no

7   secondary liability claim under Section 20(a).  15 U.S.C. § 78t(a); *Paracor Fin.,*

8   *Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).  Nor has Plaintiff

9   alleged facts demonstrating how either Individual Defendant controlled the activity

10  of the other.  *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 649, 655 (N.D. Cal.

11  1980) (dismissing "control" claims under Sections 15 and 20(a) because control

12  not adequately alleged); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d

13  1248, 1277 (N.D. Cal. 2000) (plaintiffs must plead that "defendants [had] the

14  power to dictate another party's conduct").  Status as an officer does not establish a

15  presumption of control.  *Paracor*, 96 F.3d at 1163 (CEO/Chairman, who was

16  "consulted on every major decision," was not a control person).

17      **H.    The Complaint Should Be Dismissed with Prejudice**

18      Congress appointed the federal courts as gatekeepers under the PSLRA to

19  separate the real fraud cases from cases filed on speculation, such as this one.

20  Congress was determined to protect public companies and their shareholders from

21  the enormous cost and abuse of securities class actions filed, like this one, without

22  any real evidence of fraud.  *Tellabs*, 127 S. Ct. at 2508 (citing H. R. Conf. Rep.

23  No. 104-369, at 31 (1995)).  Any complaint failing to satisfy the PSLRA pleading

24  standards "shall" be terminated at the pleading stage.  15 U.S.C. § 78u-4(b)(3)(A).

25      Plaintiff's fraud claims remain inadequate after more than a year of

26  investigation.  Plaintiff has identified only five weak witnesses.  Plaintiff has made

27  three attempts to state a claim and failed each time.  There is no reason to suppose

28

1   that Plaintiff can cure the shortcomings of his previous complaints by amending to

2   file a fourth.[16]  This case bears no earmarks of real fraud.

3          To the contrary, Impac disclosed negative information throughout the Class

4   Period, which strongly undercuts any inference of fraudulent intent.  *See In re*

5   *Bearing Point, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 769 (E.D. Va. 2007) ("truthful

6   disclosures of negative information militate against a finding that [defendants]

7   acted with a culpable state of mind").  Impac's most senior officers "went down

8   with the ship," suffering substantial losses in their own portfolios of Impac

9   common stock.  *See* Lilley Decl. ¶¶ 4-9; RJN Ex. U-V; *In re Pixar Sec. Litig.*,

10  450 F. Supp. 2d 1096, 1105-06 (N.D. Cal. 2006) (the fact that insiders retained

11  99% of their holdings "undermines any inference of scienter").[17]  Notwithstanding

12  Plaintiff's purportedly rigorous investigation, nowhere does the Complaint explain

13  why these managers, who collectively owned 453,484 common shares at the outset

14  of the Class Period, and sold none, would hold Impac stock if they really knew that

15  Impac's share price was falsely inflated and sure to decline sharply once "the truth

16  was revealed."  Lilley Decl. ¶¶ 4-9; RJN Ex. U-V; *Pixar*, 450 F. Supp. 2d at 1105-

17  06.  In short, Plaintiff has alleged no motive, no fraud, and no reason to suppose

18  that he can ever do so.

19

20

---

21  [16]  *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) (when
22  plaintiffs cannot cure the flaws in their pleading, any amendment would be
    futile); *In re Silicon Graphics*, 183 F.3d at 991 (denying leave to amend when
23  plaintiff failed to allege additional facts which might cure defects in their
    complaint); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990)
24  (denying leave to amend when plaintiff presented no new facts but only "new
    theories").

25  [17]  *See In re Wet Seal*, 518 F. Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) (absent
    allegations that defendants financially benefited through insider sales or
26  otherwise it was "unreasonable to infer fraud"); *In re Silicon Graphics*, 183
    F.3d at 987 (no strong inference of scienter where defendants retained 90% of
27  their holdings).  "[I]f, as Plaintiffs allege, the Officers knew [the company] was
    heading for financial disaster, they probably would have bailed out of their
28  substantial holdings." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-
    25 (9th Cir. 1994).

1  **IV.     CONCLUSION**

2        For the forgoing reasons, Defendants respectfully request dismissal with

3  prejudice. *In re Vantive Corp.*, 283 F.3d at 1097-98 (dismissal with prejudice is

4  warranted when plaintiffs cannot provide any additional facts they might plead).

5  Dated:  December 15, 2008

6                                                    Respectfully submitted,

7

8                                    By:   _____/s/_____

9                                          Pamela S. Palmer
                                           of LATHAM & WATKINS LLP
10                                         Attorneys for Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28